WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com

Proposed Attorney for Debtor
and Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>GROVE FARM FISH & POI, LLC,<br>dba HUKILAU FOODS,<br><br>        Debtor and<br>        Debtor-in-possession. | Case No. *10-03340*<br>(Chapter 11)<br><br><br>Date:<br>Time:<br>Judge: Hon. Robert J. Faris |

### MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN INTERIM AND FINAL POST-PETITION FINANCING ON A SUPERPRIORITY BASIS AND SCHEDULING FINAL HEARING ON MOTION; EXHIBITS "A" AND "B"

GROVE FARM FISH & POI, LLC, dba HUKILAU FOODS, debtor and

debtor-in-possession herein (the "Debtor"), hereby moves this Court, pursuant to 11

U.S.C. §§ 105 and 364(c), and Federal Rule of Bankruptcy Procedure 4001(c) for an

order: (i) authorizing, on an interim basis, the Debtor to incur debtor-in-

65016

possession financing ("DIP Financing") substantially on the terms set forth in the Debtor-in-Possession Credit Agreement attached as Exhibit "A" to the Declaration of Michael Tresler, filed herewith by entering an interim order (the "Interim Order") substantially in the form attached hereto as Exhibit "B;" and (ii) scheduling a final hearing on the motion.

In support of this motion (the "Motion"), the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## SUMMARY OF DIP FINANCING

3.     The following is a summary of the proposed DIP Financing. Terms used below and not defined shall have the meanings given them in the proposed Debtor in Possession Credit Agreement (the "Agreement") attached hereto as Exhibit "A"

    a. <u>Lender</u>:  Visionary, LLC ("Lender").

    b. <u>Amount</u>: Advances up to $3,000,000, $250,000 available on entry of Interim Order.

    c. <u>Term</u>:  24 months.

    d. <u>Use of Funds</u>:  Working capital and other budgeted expenses.

e. <u>Collateral and Priority</u>:

    i. Junior security interest in all other personal property assets of the Debtor pursuant to Section 364(c)(2) of the Bankruptcy Code; and

    ii. Super-priority over all administrative claims pursuant to Section 364(c)(2) of the Bankruptcy Code.

f. <u>Interest and Payments</u> Fixed at seven percent (7%) accrual rate with monthly payment of interest due in arrears on the first business day of each month.

g. <u>Borrowing Base</u>: N/A

h. <u>Fees</u>: N/A

i. <u>Events of Default (select)</u>:

    i. Final Order not entered by November 30, 2010;

    ii. Failure to make any payment of principal of, or interest on, or fees owing when due and payable;

    iii. Conversion or dismissal of the Debtor's chapter 11 case;

    iv. Appointment of a Trustee in the Chapter 11 case; and

j. <u>Remedies</u>:

    i. Termination of DIP Loan and acceleration of all unpaid advances;

    ii. Upon payment default or other material default under the Agreement, upon five (5) court days' notice to the Debtor and any creditors' committee, the Lender is granted relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), unless during said five-day notice period, the Debtor or any creditors' committee files a motion, supported by admissible evidence,

contesting whether a default has occurred, and within ten days thereafter, the Court enters an order finding that no payment default or other material default in fact has occurred.

k. <u>Carve-Out</u>: For the unpaid professional fees and expenses incurred by the Debtor, and the Committee of Unsecured Creditors, if any, as and when allowed on a final basis pursuant to Section 330 of the Bankruptcy Code, in an aggregate amount not to exceed $250,000, (ii) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), and (iii) unpaid fees and expenses of a chapter 7 trustee (but not any fees or expenses of any professional person employed by such chapter 7 trustee) appointed following conversion of the Chapter 11 Case to case under chapter 7 of the Bankruptcy Code.

## BACKGROUND

4.     The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on November 1, 2010.

5.     The Debtor continues to operate its businesses pursuant to 11 U.S.C. § 1107 and 1108.

6.     No creditors' committee has yet been appointed in this case.

7.     The Omnibus Declaration of Reiko Yoshida in Support of First Day Motions filed contemporaneously herein is incorporated herein by reference. Defined terms herein have the meaning set forth in the Yoshida Declaration.

<u>Financing Requirement and the Proposed DIP Loan</u>

8.     As set forth in the Declaration of Michael Tresler filed herewith, since before the Petition Date, the Debtor has not been able to obtain

4

financing for the Debtor on an unsecured or administrative basis. The Debtor has had discussions with several potential sources of financing, including First Hawaiian Bank, American Savings Bank, Central Pacific Bank, and Visionary.

9. The only party that is willing to extend financing to the Debtor on the terms set forth above is Visionary which is a 51% owner of the Debtor. None of the Lender's contacted by the Debtor would provide financing on more favorable terms than Visionary, if at all. Consequently, the terms offered by the Lender are the best terms that the Debtor has been able to negotiate in its discussions with potential sources of DIP Financing.

10. The Lender is willing to extend DIP Financing to the Debtor on the terms set forth in the Agreement which provides for a revolving line of credit of up to $3,000,000. The major terms of the proposed DIP Financing are set forth in the summary above.

## RELIEF REQUESTED AND BASIS

11. The Lender has required, and the Debtor believes it is appropriate, that the DIP Loan be on a secured, super-priority basis in accordance with Section 364(c) of the Bankruptcy Code.

12. Section 364(c) of the Bankruptcy Code, which governs the ability of a debtor or trustee to obtain secured credit provides as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the

court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

13.     The Agreement provides for all advances to have super-priority in accordance with Section 364(c)(1), and for the advances to be secured by a blanket junior lien on all other personal property of the Debtor.

14.     Section 364(e) of the Bankruptcy Code provides that the reversal or modification on appeal of a financing order "does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith . . . ." 11 U.S.C. § 364(e).

15.     The Debtor submits that the Lender is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code. The Debtor has negotiated the loan in good faith and pursuant to its business judgment. The Lender is extending DIP Financing on commercially reasonable terms.

16.     Rule 4001 authorizes the Court to hold a final hearing on a motion to obtain credit pursuant to Section 364 not less than 15 days from the date of service

of such a motion. *See* Fed.R.Bank.P. 4001. However, the Court may hold an interim hearing on an expedited basis to the extent necessary to avoid immediate and irreparable harm to the estate. *Id.*

17.     The Debtor submits that an expedited preliminary hearing on the Motion is necessary to avoid immediate and irreparable harm to the Debtor's estate. The Debtor must be able to assure customers, vendors, and employees that it has adequate liquidity to pay for operating expenses. Therefore, approval of the DIP Financing on an interim basis immediately is crucial to the Debtor's ability to maintain credibility with its vendors and customers.

18.     The terms offered by the Lender are the best terms that the Debtor has been able to negotiate in his discussions with potential sources of financing.

19.     The Debtor believes that the proposed DIP Financing is in the best interests of the estate and its creditors. With the DIP line in place, the Debtor will be assured of having adequate working capital to order goods and to improve cash flow (and thereby improving the value of the business) during the critical upcoming holiday season.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion, and enter the Interim Order: (a) authorizing the Debtor to enter into the Agreement substantially on the terms attached hereto on an interim basis by entering the Interim Order and authorizing the Debtor to borrow up to $250,000 from the Lender pending the final hearing; (b) scheduling a final hearing on the Motion on or about November 22, 2010; and (c) granting such other relief as the Court deems fair and just.

DATED:     Honolulu, Hawaii, _November 1_, 2010.

/s/ James A. Wagner
JAMES A. WAGNER
CHUCK C. CHOI
Proposed Attorney for Debtor and
Debtor-in-Possession

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

In re ) BK. NO. *10-03340*
)
) (Chapter 11)
GROVE FARM FISH & POI, LLC, dba )
HUKILAU FOODS, )
) DECLARATION OF MICHAEL
) TRESLER; EXHIBITS "A" - "B"
Debtor and )
Debtor-in-Possession. )
_____ )

## DECLARATION OF MICHAEL TRESLER IN SUPPORT OF MOTION

I, MICHAEL TRESLER, hereby declare that, if called as a witness in this action, I could and would testify competently of my own personal knowledge as follows:

1.     I am the one of the Managers of Grove Farm Fish & Poi, LLC, dba Hukilau Foods ("Debtor").  I am over the age of 18 years and I am competent to make this declaration and do so based on personal knowledge, except as otherwise indicated.

2.     I make this Declaration in support of the Motion for Order Authorizing Debtor to Obtain Interim Post-petition Financing on a Secured and Superpriority Basis and Scheduling a Final Hearing on the Motion (the "Motion"). Terms used herein and not otherwise defined shall have the meanings given to them in the Motion.

3.     I have reviewed the facts set forth in the Motion regarding the Debtor particularly those facts pertaining to the Debtor's efforts to obtain financing are true and correct to the best of my knowledge, information, and belief.

4.     In the past few weeks, I have had financing discussions with a number of potential lenders for the Debtor, including First Hawaiian Bank, AmericanSavings Bank, and Central Pacific Bank.   None of these lenders were interested in making a loan to the Debtor subordinate to the loans by NMFS.

5.     The only party that is willing to extend financing to the Debtor on a subordinated loan is Visionary, LLC, the DIP Lender. Thus, the terms offered by the DIP Lender, as set forth in the Agreement, are better than the terms offered by the other potential lenders.

6.     I have not been able to obtain financing for the Debtor on an unsecured or general administrative priority basis.

7.     Attached to the Motion as Exhibit "A" is a true and correct copy of the proposed Loan Agreement between the Debtor and the Lender in substantially final form.

8.     Attached to the Motion as Exhibit "B" is a true and correct copy of the proposed Interim Order.

9.    I believe that the terms of the proposed DIP Financing are reasonable under the circumstances, and that consummation of a loan will be in the best interests of this bankruptcy estate and creditors.

DATED:  Honolulu, Hawaii, NOVEMBER 1, 2010.

_____
MICHAEL TRESLER

# DEBTOR IN POSSESSION LOAN AGREEMENT

THIS DEBTOR IN POSSESSION LOAN AGREEMENT, dated November —, 2010, is made by and between GROVE FARM FISH & P01, LLC, a Hawaii limited liability company, whose address is 3-1850 Kaumualii Highway, Lihue, Hawaii 96766 (the "Borrower"), and VISIONARY, LLC, a Virginia limited liability company, whose address is 1100 Alakea Street, 30th Floor, Alakea Corporate Tower, Honolulu, Hawaii 96813 (the "Lender")

## RECITALS:

A.     On November 1, 2010 (the "Petition Date"), Borrower commenced Chapter 11 Case No. _____ (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court"). Borrower continues to operate its business and manages its properties as debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.     Borrower has requested that Lender provide a secured superpriority loan in the aggregate principal amount not to exceed the sum of THREE MILLION AND NO/100 DOLLARS ($3,000,000.00). Borrower intends to utilize such facility to fund its working capital requirements during the pendency of the Chapter 11 Case.

C.     Lender is willing to extend such postpetition loan to Borrower in accordance with and on the tenns and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, Borrower and Lender hereby mutually agree as follows:

## AGREEMENT

### 1. DEFINITIONS

1.1 _Defined Terms in this Agreement_. For the purpose of this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined herein):

_Accounts_ shall mean all "accounts," as such term is defined in the Code, now owned or hereafter acquired by any Person, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments), whether arising out of goods sold or services rendered by it or from any other transaction (including any such obligations that may he characterized as an account or contract right under the Code), (b) all of such Person's rights in, to and under all purchase orders or receipts for goods or services, (c) all of such Person's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed

## EXHIBIT A

goods), (d) all monies due or to become due to such Person, under all purchase orders and contracts for the sale of goods or the performance of services or both by such Person or in connection with any other transaction (whether or not yet earned by performance on the part of such Person), including the right to receive the proceeds of said purchase orders and contracts, and (e) all collateral security and guaranties of any kind given by any other Person with respect to any of the foregoing.

Advance. Any advance of funds made by Lender to Borrower under the Loan.

Agreement. This Debtor in Possession Loan Agreement as the same may, from time to time, be further amended or supplemented.

Bankruptcy Code shall have the meaning assigned to it in the recitals to the Agreement.

Bankruptcy Court shall have the meaning assigned to it in the recitals to the Agreement.

Bankruptcy Rules shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case. Borrower shall have the meaning assigned to it in the recitals to the Agreement.

Budget shall mean The Budget set forth in Exhibit "A" attached hereto.

Budgeted Cash Flow. For any time period, the amount of cumulative operating cash flow as set forth in the Budget for such applicable period.

Business Day shall mean any day other than a Saturday, Sunday or other day on which commercial banks in Honolulu, Hawaii, are authorized or required by law to close
Cash Collateral shall mean "cash collateral" as that phrase is defined in Section 3 63(a) of the Bankruptcy Code.

Carveout shall have the meaning assigned to it in the Interim Order and the Final Order.

Chapter 11 Case shall have the meaning assigned to it in the Recitals of the Agreement.

Charges. All federal, state, county, municipal, local, foreign or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of Borrower, (d) borrower's ownership or use of any properties or other assets, or (e) any other aspect of Borrower's business.

Code. The Uniform Commercial Code as the same may, from time to time, be enacted and in affect in the State of Hawaii.

Collateral shall mean the collateral described in Exhibit "B" attached hereto.

Default. Any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

EBITDA. With respect to any period, an amount equal to the sum of (a) net income for such period, plus (b) the sum of any provision for (i) income taxes, (ii) interest expense, (iii) depreciation arid amortization expenses, and (iv) the exclusion of any extraordinary items for such period, all determined in accordance with GAAP. Notwithstanding the generality of the foregoing, any restructuring charges (including cumulative legal, accounting or professional expenses and U.S. Trustee fees incurred in accordance with Cumulative Weekly Operating Budgets) shall be added back into net income of such Person for purposes of determining EBITDA.

Environmental Laws. All applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1940 (42 U.S.C. § 9601 et seq.) the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. § 5101 et seq.) the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq); the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.) the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.) the Clean Air Act (42 U.S.C. § 7401 et seq.) the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.) the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) and the Safe Drinking Water Act (42 U.S.C. § 300(1) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

Environment Liabilities. With respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any release or threatened release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

**Environmental Permits.** All permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

**Event of Default.** The meanings assigned to that term in Section 7.1 of this Agreement.

**Final Order.** The final order of the Bankruptcy Court in the Chapter 11 Case after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, and from which no appeal has been timely filed, or if timely filed, no stay pending appeal shall have been granted, together with all extensions, modifications and amendments thereto (which extensions, modifications and amendments shall be acceptable to Lender and Borrower), authorizing Borrower to obtain credit, incur indebtedness, and grant liens under the Agreement and the other Loan Documents and providing for the superpriority of Lender's claims, all as set forth in such order.

**Fiscal Year.** The fiscal year of Borrower which ends on December 31, 2010.

**GAAP.** Generally accepted accounting principles, consistently applied.

**Governmental Authority.** Any governmental office, officer or official whose consent, approval or permit is required as a prerequisite to the performance or observance of any agreement, provision or condition contained in this Agreement.

**Gross Inventory.** All Inventory held by Borrower for sale.

**Gross Receivables.** All of Borrower gross trade receivables arising from the sale of goods and/or food or fish products.

**Hazardous Material.** Any substance, material or waste which is regulated by or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (i) defined as a "solid waste,""hazardous waste,""hazardous material,""hazardous substance,""extremely hazardous waste,""restricted hazardous waste,""pollutant,""contaminant,""hazardous constituent,""special waste,""toxic substance" or other similar term or phrase under any Environmental Laws, (ii) petroleum or any fraction or byproduct thereof asbestos, polychlorinated biphenyls (PCB' s), or any radioactive substance.

**Interim Order.** The interim order of the Bankruptcy Court, authorizing, on an interim basis, Borrower to execute and perform under the terms of the Agreement and the other Loan Documents.

**Inventory.** All "inventory," as such term is defined in the Code, now owned or hereafter acquired by any Person, wherever located including inventory, merchandise, goods, fish, fish products, and other personal property that are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in such

Person's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including other supplies.

Leases shall mean any and all equipment and personal property, leases, permits or licenses in which Borrower has an interest as lessee, permittee or licensee.

Lender shall have the meaning assigned to it in the recitals to the Agreement.

Lien. Any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

Loan. An amount not to exceed the sum of THREE MILLION AND NO/100 DOLLARS ($3,000,000.00).

Loan Documents. This Agreement, the Note, the Interim Order and the Final Order, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower, or any president, vice president, chief financial officer, or, with respect to corporate certificates, corporate secretary of Borrower, and delivered to Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Agreement or Loan Documents, as applicable, as the same may be in effect at any and all times such reference becomes operative.

Mortgage means that certain Leasehold Mortgage, Security Agreement, and Financing Statement of even date herewith executed by Borrower, as mortgagor, for the benefit of Lender, as mortgagee, and encumbering the Property.

Note. The Promissory Note made, executed and delivered by Borrower to Lender.

Obligations. All loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to Lender under this Agreement, and all covenants and duties regarding such amounts, of any kind or nature, present of future, whether or not evidenced by any note, agreement or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Agreement or any of the other Loan Documents.

Person. Any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

Petition Date shall have the meaning assigned to it in the recitals to the Agreement.

Proceeds shall mean "proceeds," as such term is defined in the Code, including (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Person from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Person from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of governmental authority), (iii) any claim of any Person against third parties (A) for past, present or future infringement of any Patent or Patent License, or (B) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the Goodwill associated with any Trademark or Trademark License, (iv) any recoveries by any Person against third parties with respect to any litigation or dispute concerning any of the Collateral, and (v) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral, upon disposition or otherwise.

Termination Date shall mean the earliest of: (i) the date which is twenty-four (24) months from the date of this Agreement; (ii) the date of termination of Lender's obligations to make Advances including, but not limited to, termination pursuant to Section 7.4; (iii) November 5, 2010 if the Interim Order has not been entered by the Bankruptcy Court by such date; (iv) December 6, 2010, if the Final Order has not been entered by the Bankruptcy Court by such date, unless the Interim Order has been extended with Lender's written consent to a date acceptable to Lender; (v) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date; (vi) the date a plan of reorganization in the Chapter 11 Case become effective; and (vii) the date the Loan is accelerated following an Event of Default.

## 2. LOAN

2.1   Loan Amount. So long as Borrower is not in default under this Agreement, Lender hereby agrees to make Advances to Borrower in an aggregate principal amount not to exceed THREE MILLION AND NO/100 DOLLARS ($3,000,000.00).

2.2   Disbursements. Upon the execution of this Agreement and entry of the Interim Order, Lender shall advance an amount up to $250,000.00 and shall advance additional amounts up to $250,000.00 per month plus the amount of any capital expenses included in the Budget.

2.3   Use of Funds. Borrower will apply all proceeds of the Loan for general working capital purposes in the normal course of business operations, including, without limitation, all

items in approved budgets, and payment of accounts payable arising after the Petition Date, and for capital expenses provided for in the Budget.

2.4     Borrowing. Subject to paragraph 2.2 above, Borrower may from time to time borrow, repay outstanding Advances, and reborrow all or a portion of the Loan.

2.5     Note. To evidence Borrower's promise to repay to Lender the Loan, together with interest at the rate, time and place, and in the manner described herein, Borrower shall execute and deliver to Lender the Note.

2.6     Interest Rate. Interest on the aggregate principal amount outstanding under the Loan shall accrue at a fixed rate of seven percent (7%) per annum. Interest shall be computed on the basis of the actual number of days elapsed between payments and on the basis of a 360-day year. From and after the occurrence of any Event of Default, the interest rate shall increase by three percent (3%) over the interest rate otherwise payable by Borrower hereunder.

2.7     Loan Fee. Upon the execution of this Agreement, Borrower agrees to pay Lender a loan fee in the amount of TEN THOUSAND AND NO/l00 DOLLARS ($10,000.00).

2.8     Monthly Servicing Fee. Commencing upon the execution of this Agreement, and continuing on the same day each month until the Termination Date, Borrower shall pay a monthly servicing fee to Lender in the amount of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00).

2.9     Repayment. Interest only on the actual balance outstanding on the Loan shall be due on the first Business Day of each month. Unless Borrower and Lender agree in writing to extend the term of the Loan, all unpaid principal amounts, together with all unpaid interest, shall he due and payable on the Termination Date, with the exception of any termination pursuant to Section 7.4 below. All payments of principal and interest shall be remitted to Lender in immediately available funds by 10:00 a.m. on their respective due dates.

2.10     Late Charges. If any payment under this Agreement is not made within five (5) calendar days of its due date, Borrower shall pay Lender a late charge in the amount of three percent (3%) of the overdue payment.

2.11     Security. The entire amount of the Loan shall be secured by the Collateral.

2.12     Priority of Obligations and Lender's Liens.

(a) The priority of Lender's Liens on the Collateral shall be set forth in the Interim Order and the Final Order and shall be junior to the lien of National Marine Fisheries, if any.

(b) The Obligations shall have the highest administrative priority equivalent to a claim under Section 364(c)(i) of the Bankruptcy Code. Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified

in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceedings or case under the Bankruptcy Code.

(c) Lender's Liens on the Collateral and the administrative claim under Section 364(c)(i) of the Bankruptcy Code afforded the Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject to (i) the unpaid professional fees and expenses incurred by Borrower, and the Committee of Unsecured Creditors, if any, as and when allowed on a final basis pursuant to Section 330 of the Bankruptcy Code, in an aggregate amount not to exceed $250,000, (ii) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), and (iii) unpaid fees and expenses of a Chapter 7 trustee (but not any fees or expenses of any professional person employed by such Chapter 7 trustee) appointed following conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (collectively, the "Carve-Out"); provided, that such fees and disbursements shall not (1) include any fees or expenses arising after the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (other than as provided in subparagraph (iii) above).

## 3.    REPRESENTATIONS AND WARRANTIES

Borrower makes the following representations and warranties to Lender, which representations and warranties shall survive the execution of this Agreement and continue so long as Borrower are indebted to Lender under the Loan:

3.1    Legal Status. Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Hawaii.

3.2    Powers. The execution and delivery by Borrower of this Agreement and the other Loan Documents, and the doing and performance of all acts herein and therein provided to be done and performed by Borrower are, subject to the Bankruptcy Court's approval, within the powers of Borrower.

3.3    Corporate Power, Authorization, Enforceable Obligations. The execution, delivery and performance by Borrower of the Loan Documents and the creation of all Liens provided for therein: (a) are within Borrower's power; (b) have been duly authorized by all necessary or proper action; (c) have been duly authorized by the Bankruptcy Court; (d) do not contravene any provision of Borrower's charters or bylaws; (e) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (f) except to the extent permitted by the Interim Order or the Final Order, as the case may he, do not conflict with acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower are a party or by which Borrower or any of its property is bound; (g) do not result in the creation or imposition of any Lien upon any of the property of Borrower other than those in favor of Lender; and (h) except as otherwise provided by the Interim Order or the Final Order, as the case may be, do not require the consent or approval of any Governmental Authority or any other Person, except for the Bankruptcy Court, all of which will have been duly obtained, made or complied with prior to the execution of this

Agreement. Each of the Loan Documents has been duly executed and delivered by each Borrower that is a party thereto and, subject to the entry of the Interim Order and the Final Order, as applicable, each such Loan Document constitutes a legal, valid and binding obligation of Borrower enforceable against them in accordance with its terms.

3.4 <u>Validity</u>. This Agreement and the Loan Documents executed by Borrower are valid and binding agreements of Borrower, and the Note is a valid and binding obligation of Borrower, enforceable in accordance with their respective terms.

3.5 <u>Approvals</u>. No license, authorization, consent or approval of any other person, corporation or Governmental Authority is required for Borrower to perform as agreed under the Loan Documents or any other agreement herein mentioned to which Borrower is a party, or if any such license, authorization, consent or approval is required, the same has been obtained.

3.6 <u>Correctness of Financial Statements.</u> The financial statements of Borrower heretofore delivered to Lender fairly present the financial condition of Borrower as of the date of such financial statements and have been prepared in accordance with GAAP except as otherwise disclosed in writing by Borrower to Lender.

3.7 <u>No Adverse Development</u>. As of the date of such financial statements, and since the date of their preparation; there has been no material adverse change in the condition of Borrower or the operation of Borrower's business, except as otherwise disclosed in writing by Borrower to Lender in writing. Neither Borrower, nor Borrower's business, nor (so far as Borrower can now foresee) the prospects or the condition (financial or otherwise) of Borrower, has been materially adversely affected in any way (whether or not insured) by any event including, but not limited to, any termination of a lease or sublease, any revocation of a license to do business, or any fire, explosion, flood, drought, windstorm, earthquake, accident, casualty, labor trouble, condemnation, embargo, act of God, activity of the armed forces of the United States or otherwise, except as otherwise disclosed in writing by Borrower to Lender.

3.8 <u>Disclosure of Material Facts.</u> Neither this Agreement nor any of the other Loan Documents, nor any document furnished to Lender by or on behalf of Borrower in connection with or in order to induce Lender to offer the Loan to Borrower contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading, except as otherwise disclosed by Borrower to Lender in writing.

3.9 <u>Income Tax Returns.</u> As of the date of this Agreement all Federal and State tax returns of Borrower required to he filed have been filed, and Borrower has no knowledge of any pending assessments or adjustments of its income tax payable with respect to any year subsequent to the date hereof. There are no Federal, State, or other taxes due and owing by Borrower that are now delinquent, except such assessments which Borrower may be contesting in good faith and for which provisions for payment have been made, and the circumstances and materiality of which Borrower have disclosed in writing to Lender.

3.10 <u>Litigation.</u> With the exception of the Chapter 11 Case and those matters disclosed

in writing by Borrower to Lender prior to the date of this Agreement, there are no pending or threatened actions or proceedings before any court or administrative agency which may adversely affect the financial condition or operation of Borrower or which purport to affect the legality, validity or enforceability of any Loan Documents, or which may adversely affect Borrower's ability to observe and perform its obligations under the Loan Documents, and there are no outstanding and unpaid judgments against Borrower.

3.11 <u>No Subordination.</u> With the exception of those obligations of Borrower disclosed in writing by Borrower to Lender prior to the date of this Agreement, the Obligations of Borrower under this Agreement, the Note, and the other Loan Documents are not subordinate in right of payment to any other indebtedness of Borrower.

3.12 <u>Permits, Franchises.</u> Borrower possesses, and will hereafter possess, all permits, memberships, franchises, contracts, and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights, and fictitious name rights necessary to enable Borrower to conduct the business in which Borrower is now engaged without conflict with the rights of others.

~~3.13 No Broker. Borrower has not employed or engaged any broker, finder or agent~~ who may claim a commission or fee or other compensation with respect to the Loan.

## 4. GENERAL AFFIRMATIVE COVENANTS

Borrower agrees that from and after the date of this Agreement and until the Termination Date Borrower shall:

4.1 <u>Maintenance of Existence and Conduct of Business.</u> Borrower shall: (a) do or cause to be done all things necessary to preserve and keep in full force and effect its existence and its rights and franchises; (h) continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; and (c) at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices.

4.2 <u>Payment of Obligations.</u>

(a) Except as nonpayment is permitted or payment is prohibited by the Bankruptcy Code or the Bankruptcy Court, Borrower shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it, including (i) Charges imposed upon them, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, and (ii) lawful claims for labor, materials, supplies and services or otherwise, before any thereof shall become past due; provided, however, that Borrower shall not be required to pay any applicable real property taxes which are not yet due and payable.

(b) Borrower may in good faith contest, by appropriate proceedings, the validity or amount of any Charges or claims; provided, that (i) adequate reserves with respect to such contest are maintained on the books of Borrower in accordance with GAAP, (ii) no Lien shall be imposed to secure payment of such Charges that is superior to any of the Liens securing payment of the Obligations and such contest is maintained and prosecuted continuously arid with diligence and operates to suspend collection or enforcement of such Charges, (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest, and (iv) Borrower shall promptly pay or discharge such contested Charges or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lender evidence acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to Borrower or the conditions set forth in this Section 4.2(b) are no longer met.

4.3     Accounting Records. Keep and maintain accurate and proper books of record and account in accordance with GAAP. Lender shall have the right on reasonable notice during normal business hours to examine the Borrower's books of account and to discuss the affairs, finances and accounts of Borrower, and to be informed as to the same by its officers, employees or agents, and inspect the Collateral, all at such reasonable times and intervals as Lender may desire.

4.4     Financial Reporting. Furnish or cause to he furnished to Lender, the following financial reports:

(a) Prior to execution of this Agreement, Borrower shall provide Lender with the Budget;

(b) Within twenty-one (21) calendar days after the end of each Fiscal month, monthly financial statements of Borrower, including income statements and balance sheets of Borrower for such month, an accrual based profit and loss statement including EBITDA, and operating statements in reasonable detail sufficient to establish the total amount outstanding of Borrower's Accounts and Inventory, all in reasonable detail and prepared in accordance with GAAP;

(c) Within twenty-one (21) calendar days after the end of each fiscal quarterly accounting period, quarterly financial statements of Borrower, including income statements and balance sheets of Borrower for such quarter, an accrual based profit and loss statement including EBITDA, all in reasonable detail and prepared in accordance with GAAP, together with certifications and compliance certificates from the chief financial officer of Borrower in a form satisfactory to Lender;

(d) Within ninety (90) calendar days after the end of each Fiscal Year, annual unaudited financial statements of Borrower, including income statements, balance sheets, and a statement of changes in cash flows;

(e) No later than forty-five (45) days prior to the commencement of each Fiscal Year, Borrower's annual operating budget for such Fiscal Year; and

(f) Any such additional documents and/or prerequisites as are normal and customary according to industry standards and which Lender may in its discretion require.

4.5    Additional Reporting. Borrower shall immediately deliver or cause to be delivered to Lender or Lender's counsel copies of all pleadings, motions, applications, financial reports and other documents filed by or on behalf of Borrower or the Office of the U.S. Trustee in the Chapter 11 Case.

4.6    Litigation. Within three business days after learning of such event, give notice in writing to Lender of any pending or threatened litigation involving Borrower.

4.7    Notice to Lender. Promptly and in no event later than three business days after learning of such event, give notice in writing to Lender of (1) the occurrence of any Event of Default; (2) any change in name of the Borrower; or (3) any uninsured or partially uninsured loss through fire, theft, liability or property damage in excess of any aggregate amount of $100,000.00.

4.8    Permits. ~~Possess all permits, contracts and licenses required, and the trade name~~ and trade name rights required by any governmental or regulatory authority or agency having jurisdiction over the business or operations of Borrower.

4.9    Environmental Matters. Borrower shall and shall cause each Person under its control to: (a) conduct its operations and keep and maintain its real estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a material adverse effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the real estate or to otherwise materially comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Material on, at, in, under, above, to, from or about any of its real estate; (c) notify Lender promptly after Borrower becomes aware of any violation of Environmental Laws or Environmental Permits or any release on, at, in, under, above, to, from or about any real estate that is reasonably likely to result in Environmental Liabilities in excess of $100,000; and (d) promptly forward to Lender a copy of any order, notice, request for information or any communication or report received by Borrower in connection with any such violation or release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably he expected to result in Environmental Liabilities in excess of $100,000, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter. If Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by Borrower or any Environmental Liability arising thereunder, or a release of Hazardous Materials on, at, in, under, above, to, from or about any of its real estate, that, in each case, could reasonably be expected to have a material adverse effect, then Borrower shall, upon Lender's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, in each case at Borrower's expense, as Lender may from time to time reasonably request,

all of which shall be conducted by reputable environmental consulting firms reasonably acceptable to Lender and shall be in form and substance acceptable to Lender, and (ii) permit Lender or its representatives to have access to all real estate for the purpose of conducting such environmental audits and testing as Lender reasonably deems appropriate, including subsurface sampling of soil and groundwater. Borrower shall reimburse Lender for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

## 5.    NEGATIVE COVENANTS

Borrower further covenants that without prior written consent of Lender from and after the date hereof until the Termination Date, Borrower shall not:

5.1    <u>Use of Funds.</u> Use any of the proceeds of the Loan for purposes other than the purpose stated in Section 2.3 of this Agreement.

5.2    <u>New Indebtedness.</u> Borrower shall not create new Indebtedness (except short term borrowings from Lender and borrowings under this Agreement) or enter into any leases for capital items, or real property; or guarantee or become liable in any way as surety, endorser (other than as endorser of negotiable instruments or as principal under any bid bond, labor and material payment bond, or performance bond required to be furnished in the ordinary course of business) or accommodation endorser or otherwise incur the debt or obligation of any other person or entity without the Lender's prior written consent, except that Borrower may purchase goods and services from suppliers in the ordinary course of its business, and incur liability therefor.

5.3    <u>Merger Consolidation Sale of Stock or Assets.</u> Merge into or consolidate with any corporation or other entity, or acquire all or substantially all of the assets of any other corporation or entity; or sell or permit to be sold, assigned, pledged or transferred, any equity interest of Borrower; or sell, assign, transfer, pledge or otherwise dispose of any major asset of Borrower, including the Collateral, except that Borrower may sell inventory in the ordinary course of its business, and may sell other assets with Bankruptcy Court approval.

5.4    <u>Loans and Advances.</u> Make any loans, advances or other extensions of credit to any person or entity in any manner, except that Borrower may sell inventory to third parties in the ordinary course of its business, on reasonable and usual commercial terms, or on terms approved in advance by Lender.

5.5    <u>Dividends and Distributions.</u> Declare or pay any dividends, either in cash, stock or other property; or redeem, retire, purchase or otherwise acquire any shares of any class of Borrower's stock outstanding; or make loans or advances between or among Borrower and/or any affiliate or subsidiary or to repay or to permit the repayment of any such loans; or make loans or advances between or among Borrower and any shareholder, officer, director, employee, affiliate or subsidiary.

5.6    <u>Other Business.</u> Change the character of Borrower's current business, or engage in any other types of business other than those currently engaged.

5.7     Bonuses. Pay to any officer or director of Borrower any bonuses or other compensation other than salary without the Lender's prior written consent or an order of the Bankruptcy Court.

5.8     Amendment to Articles. Amend the Articles of Association, Operating Agreement or By-Laws of Borrower.

5.9     Sale, Liens or Encumbrances. Mortgage, assign, convey, sell, lease or otherwise dispose of or encumber its interest in the Collateral or the income stream therefrom, or agree to do so, or permit any such action to be taken, or enter into any negative pledge agreement applicable to the Collateral or any part thereof with any person or entity other than Lender.

## 6.     CONDITIONS PRECEDENT

The obligation of Lender to make advances under the Loan is subject to all of the following conditions:

6.1     Approval of Lender's Counsel. All Loan Documents and all legal matters incidental to the Loan funding shall be satisfactory to Lender's counsel.

6.2     Compliance. The representations, warranties and covenants contained herein shall be true on and as of the effective date of this Agreement, and on the date of each funding of an Advance under the Loan, with the same effect as though such representations, warranties and covenants had been made on and as of such date, and on such date no Event of Default as defined in this Agreement or in any other Loan Document, and no condition, event or act which, with the giving of notice or the lapse of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist.

## 7.     EVENTS OF DEFAULT

7.1     Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion of the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefore) shall constitute an "Event of Default" hereunder:

(a)     Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Loan, or the Obligations when due and payable, or (ii) shall fail to pay or reimburse Lender for any expense reimbursable hereunder or under any other Loan Document within 10 Business Days following Lender's demand for such reimbursement or payment of expenses.

(b)     Borrower shall fail or neglect to perform, keep or observe any other provision of this Agreement or of any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 7.1) and the same shall remain unremedied for 30 days or more.

(c)     Except for defaults occasioned by the filing of the Chapter 11 Case and

defaults resulting from obligations with which the Bankruptcy Code prohibits Borrower from complying or permits Borrower not to comply, a default or breach shall occur under any other agreement, document or instrument to which Borrower is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any indebtedness (other than the Obligations) of Borrower in excess of $100,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, indebtedness or a portion thereof in excess of $100,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(d)     Any representation or warranty herein or in any Loan Document or in any written statement, report, or certificate made or delivered to Lender by Borrower is untrue or incorrect in any material respect as of the date when made or deemed made, or, with respect to any financial information, shall not present fairly in accordance with GAAP (subject to normal year-end adjustments) the information contained therein.

(e)     Borrower shall bring a motion in the Chapter 11 Case: (i) to obtain working capital financing from any Person other than Lender under Section 364(d) of the Bankruptcy Code; or (ii) to obtain financing from any Person other than Lender under Section 364(c) of the Bankruptcy Code (other than with respect to a financing used, in whole or in part, to repay in full the Obligations); or (iii) to grant any Lien upon or affecting any Collateral; or (iv) **to use** Cash Collateral of Lender under Section 363(c) of the Bankruptcy Code without Lender's prior written consent; or (v) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (vi) any other action or actions adverse to Lender, or its rights and remedies hereunder or its interest in the Collateral that would, individually or in the aggregate, have a material adverse effect.

(f)     The allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral in excess of $25,000 in the aggregate.

(g)     The occurrence of any postpetition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a material adverse effect.

(h)     The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, business, or reorganization of Borrower.

(i)     The Chapter I I Case shall be dismissed or converted from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code.

(j)     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor (other than Lender) to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or

regulatory agency or authority which could reasonably be expected to have a material adverse effect.

(k)     The Interim Order or the Final Order shall be modified without Lender's prior written consent.

(1)     There shall commence any suit or action against Lender by or on behalf of (i) Borrower, (ii) the Environmental Protection Agency, (iii) any state environmental protection or health and safety agency, or (iv) any official committee in the Chapter 11 Case, in each case that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of Lender and, if such suit or action is commenced by any Person other than Borrower or any officer, or employee of Borrower, it shall not have been dismissed or stayed within 60 days after service thereof on Lender and, if stayed, such stay shall have been lifted.

(m)     Any material provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any security interest created under any Loan Document shall cease to he a valid and perfected first priority security interest or Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

7.2     <u>Remedies.</u> If any Event of Default shall have occurred and be continuing, Lender may: (a) stay Lender's performance under this Agreement, whereupon Lender shall have no further duty to make Advances under this Agreement; (b) declare all principal of and accrued interest on, the Loan and all other Obligations to be immediately due and payable; (c) upon seven (7) Business Days' written notice to Borrower, revoke Borrower's rights to use Cash Collateral in which Lender has an interest; and (d) exercise any and all other rights and remedies under the Loan Documents, the Interim Order, the Final Order and applicable law or at equity. Pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall he modified and vacated to permit Lender to exercise its remedies under this Agreement and the other Loan Documents, without further application or motion to, or order from, the Bankruptcy Court. Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Loan Documents pursuant to clause (d) above, Borrower shall assist Lender in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

7.3     <u>Waivers by Borrower.</u> Except as otherwise provided for in this Agreement or by applicable law, Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby

ratifies and confirms whatever Lender may do in this regard; and (b) the benefit of all valuation, appraisal, marshaling and exemption laws.

7.4     Termination of Borrower's Authority to Obtain Advances. Borrower's authority to obtain Advances under the Loan shall terminate if any of the following events occur and Lender gives Borrower three (3) Business Days written notice of such termination:

(a) The Borrower's actual operating loss for any monthly Budget period is more than 30% above the Budgeted loss for such period.

(b) The Borrower fails to reach an agreement with Oceanic Institute for the use of its facility for production of fingerlings on or before December 31, 2010.

(c) The Borrower fails to file a Plan acceptable to Lender on or before May 1, 2011.

(d) Borrower shall fail by December 31, 2011 to obtain a final, unappealed order confirming a plan of reorganization.

## 8. MISCELLANEOUS

8.1     Waiver. The making of any Advance, the delay or failure of Lender, or any holder of the Note, in exercising any right, power or privilege hereunder or any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege shall not affect such right, power or privilege. The rights and remedies of Lender hereunder are cumulative and not exclusive. Any waiver, permit, consent or approval of any kind by Lender, or any holder of the Note, of any breach or Event bf Default hereunder, or any waiver of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent set forth in writing.

8.2     Notices. All notices, demands or documents which are required or permitted to be given or served hereunder shall be in writing and sent by first class, registered, or certified mail, postage prepaid, or by hand delivery, addressed as follows:

To Lender:          Visionary, LLC
                    1100 Alakea Street, 30th Floor
                    Alakea Corporate Tower
                    Honolulu, Hawaii 96813

Copy to:            Case Lombardi & Pettit
                    737 Bishop Street, Suite 2600
                    Honolulu Hawaii 96813
                    Attn: Ted N. Pettit, Esq.
                    Phone: (808) 547-5400

| To Borrower: | Grove Farm Fish & Poi, LLC 3- |
| | 1850 Kaumualii Highway |
| | Lihue, Hawaii 96766 |
| | Attn: Reiko Yoshida |
| | Phone: (808) 623-2533 |
| | |
| Copy to: | Wagner Choi & Verbrugge |
| | Topa Financial Center |
| | Fort St. Tower |
| | 745 Fort St., Suite 1900 |
| | Attn: James A. Wagner, Esq. |
| | Phone: (808) 533-1877 |

These addresses may be changed from time to time by serving notice to all other parties as provided above. Service of such notice or demand shall be deemed complete on the day of actual delivery or at the expiration of the second day after the date of mailing, whichever is earlier.

8.3   Fees and Expenses. Borrower will reimburse Lender on demand for all costs and expenses incurred in connection this Agreement, including without limitation the costs and fees of advisors, consultants and attorneys to Lender, and all fees expended or incurred by Lender in preparing the Loan Documents, in administering and enforcing the same, in the analysis, evaluation, negotiation, documentation and administration of any loan "work out" proposal (whether or not effectuated), in the investigation and policing of any Event of Default, in actions in any way related to this Agreement, in collecting any sum which becomes due Lender on the Note, the Loan, or the Loan Documents, and on any and every account.

8.4   Hawaii Law Applicable. This Agreement, the Note and the other Loan Documents shall be governed by and construed in accordance with the laws of the State of Hawaii.

8.5   Entire Agreement. This Agreement, the Note and the other Loan Documents contain the entire agreement between Lender and Borrower with regard to the Loan. The provisions of this Agreement may not be modified or amended without the written consent of Lender.

8.6   No Assignment. Borrower may not assign its rights under this Agreement, nor permit its rights or any part of any loan made hereunder to be assigned or encumbered, without the prior written consent of Lender.

8.7   Inurement. The provisions of this Agreement shall be binding upon and inure to the benefit of Borrower and Lender, and their respective successors and permitted assigns as the context of this Agreement may require. Throughout this Agreement, unless clearly repugnant to the context, the singular shall include the plural and the use of a pronoun of one gender shall refer to all genders.

8.8    Time of the Essence. Time is of the essence in Borrower's observance and performance of its obligations in this Agreement, the Note and the other Loan Documents.

8.9    Parties Including Trustee, Bankruptcy Court Proceedings. This Agreement, the other Loan Documents, and all security interests and Liens created hereby or pursuant to any other Loan Document shall be binding upon Borrower, the estate of Borrower, and any trustee or successor in interest of Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and each of its assigns, transferees and endorsees. The security interests and Liens created by this Agreement, and the other Loan Documents shall be and remain valid and perfected in the event of conversion of the Chapter 11 Case or any other bankruptcy case of the Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the property of Borrower or jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.

8.10    Paragraph Headings. The headings of paragraphs and subparagraphs herein are inserted only for convenience and reference and shall in no way define, limit or describe the scope or intent of any provision of this Agreement.

8.11    Severability. If any provision of this Agreement, the Note or the other Loan Documents is held to be invalid or unenforceable, the validity and enforceability of the other provisions of this Agreement, the Note and the other Loan Documents will remain unaffected.

8.12    Indemnification. Borrower shall indemnify and hold Lender harmless from any and all liability arising from the extension of the Loan to Borrower, or the relationship created between Borrower and Lender, including all awards, judgments, orders, costs, expenses and attorneys' fees reasonably incurred by Lender, provided that Borrower shall not be liable to Lender for any portion of such liability resulting from Lender's gross negligence or willful misconduct.

8.13    Joint and Several Obligations. The covenants, conditions and agreements of Borrower herein contained shall be the joint and several obligation of each of the entities constituting Borrower, and shall be binding upon each of them and their respective successors and assigns.

8.14    Counterparts. This Agreement maybe executed in counterparts.

8.15    Accounting Terms. All accounting terms not specifically defined in this Agreement shall he construed in accordance with GAAP, applied on a consistent basis.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective the day and year set forth above.

GROVE FARM FISH & POI, LLC, a
Hawaii limited liability company

By: KA PO`E HANA LLC, Its Manager

By: _____
    Name:
    Its:

                    Borrower

VISIONARY, LLC,
a Virginia limited liability company

By: _____
    Name: _____
    Its: _____

                    Lender

| | 2010 Nov | Dec | 2011 Jan | Feb | Mar | Apr | May | Jun | Jul |
|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | |
| SALES - FISH | 23,460 | 78,200 | - | 46,920 | - | - | - | - | 253,125 |
| | | | | | | | | | |
| **Expenses** | | | | | | | | | |
| SIMPLE IRA PLAN EMPLOYER | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| CAGES ENVIRONMENTAL MONITORING | - | - | - | - | 4,979 | - | - | - | - |
| OFFICE SUPPLIES | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| EQUIPMENT REPAIRS | - | | | | | | | | |
| POSTAGE | - | | | | | | | | |
| AUTOMOBILE | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| REFUSE SERVICE | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 |
| EQUIPMENT RENTAL | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| WATER | - | | | | | | | | |
| TELEPHONE | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 |
| MEALS | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| ACCOUNTING FEES | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| MANAGEMENT FEES | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| LEGAL FEES | 60,000 | 60,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 20,000 |
| CONTRACT LABOR | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| LICENSE & PERMITS | - | | | | | | | | |
| CONTRIBUTIONS | - | | | | | | | | |
| MARKETING | - | - | 227 | 227 | 227 | 227 | 227 | 96 | 96 |
| DUES & SUBSCRIPTIONS | | 150 | | | 150 | | | 150 | |
| STATE TAXES | - | 250 | - | 250 | - | - | - | - | - |
| FEED - HATCHERY/NURSERY | | 16,000 | | | | 16,000 | | | |
| LABOR - HATCH/NURS | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 |
| LABOR - FABRICATION | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| BENEFITS/TAXES - HATCH/NURS | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 |
| OCEANIC RENT EXPENSE | 27,000 | 27,000 | | | 27,000 | 27,000 | | | |
| OPERATIONS - HATCH/NURS | 5,000 | 2,000 | | | 2,000 | 2,000 | | | |
| OCEANIC SUPPLIES | 2,400 | | | | | | | | |
| FEED - CAGES | 9,548 | 9,548 | 23,577 | 34,573 | 25,179 | 30,492 | 54,608 | 79,464 | 71,379 |
| LABOR - CAGES | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 23,100 | 23,100 | 23,100 |
| BENEFITS/TAXES - CAGES | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 13,860 | 13,860 | 13,860 |
| OPERATIONS - CAGE FIXED | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| REAL PROPERTY TAX | 569 | 569 | 569 | 569 | 569 | 569 | 569 | 569 | 569 |
| DEPRECIATION EXP | | | | | | | | | |
| ELECTRICITY | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| INSURANCE | 3,480 | 3,480 | 3,480 | 3,480 | 3,480 | 3,480 | 3,480 | 3,480 | 3,480 |
| LAND RENTAL | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| SALARY - RANDY | - | | | | | | | | |
| BOAT REPAIR | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CAGES REPAIR & MAINTENANCE | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| CAGES - HARVEST EQUIPMENT | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| CAGES - FEED BOAT | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 |
| DEPT OF COMMERCE LOAN PAYMENTS | 39,276 | 31,733 | 25,487 | 39,276 | 31,733 | 25,487 | 39,276 | 31,733 | 25,487 |
| FINANCE CHARGES | 167 | 167 | 175 | 167 | 167 | 468 | 2,416 | 3,461 | 5,365 |
| | | | | | | | | | |
| Total Expenses | 240,175 | 243,632 | 206,251 | 211,277 | 228,219 | 238,459 | 236,672 | 255,049 | 222,472 |
| | | | | | | | | | |
| CAP EX - Hookupu Motor | | | 80,000 | | | | | | |
| CAP EX - Aqualife Fish Pump | | | 40,000 | | | | | | |
| CAP EX - Replace Cage Nets | | | 188,000 | | | 188,000 | | | |
| CAP EX - Video Monitoring System | | | | | | | | | 38,000 |
| | | | | | | | | | |
| Cash Flow | (216,715) | (165,432) | (514,251) | (164,357) | (228,219) | (426,459) | (236,672) | (255,049) | (7,347) |
| | | | | | | | | | |
| **Revenue Forecast** | | | | | | | | | |
| Cage3 | | | | | | | - | | 56,250 |
| Cage1 | 6,000 | | | | | | | | |
| Cage4 | | 20,000 | | | | | | | |
| Cage2 | | | | 12,000 | | | | | |
| Estimated lbs | 6,000 | 20,000 | - | 12,000 | - | - | - | - | 56,250 |
| Estimated price per lb ave | $ 3.91 | $ 3.91 | $ 3.91 | $ 3.91 | $ 3.91 | $ 3.91 | $ 3.91 | $ 3.91 | $ 4.50 |
| Estimated Revenue | 23,460 | 78,200 | - | 46,920 | - | - | - | - | 253,125 |
| | | | | | | | | | |
| **Feed Assumptions** | | | | | | | | | |
| Cage3 | | | 12,536 | 19,866 | 16,786 | 20,328 | 23,870 | 33,110 | 30,800 |
| Cage1 | | | 6,268 | 9,933 | 8,393 | 10,164 | 11,935 | 16,555 | 15,400 |
| Cage4 | 4,774 | 4,774 | | | | | 12,536 | 19,866 | 16,786 |
| Cage2 | 4,774 | 4,774 | 4,774 | 4,774 | | | 6,268 | 9,933 | 8,393 |
| | 9,548 | 9,548 | 23,577 | 34,573 | 25,179 | 30,492 | 54,608 | 79,464 | 71,379 |

# EXHIBIT A

| | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|
| | 337,500 | 84,375 | 253,125 | 337,500 | 84,375 |
| | | | | | |
| | 900 | 900 | 900 | 900 | 900 |
| | - | - | - | - | - |
| | 100 | 100 | 100 | 100 | 100 |
| | - | - | - | - | - |
| | - | - | - | - | - |
| | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| | 235 | 235 | 235 | 235 | 235 |
| | 400 | 400 | 400 | 400 | 400 |
| | - | - | - | - | - |
| | 850 | 850 | 850 | 850 | 850 |
| | 250 | 250 | 250 | 250 | 250 |
| | 300 | 300 | 300 | 300 | 300 |
| | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| | 5,000 | - | - | - | - |
| | 600 | - | - | - | - |
| | - | - | - | - | - |
| | 96 | 96 | 96 | - | - |
| | | 150 | | | 150 |
| | 1,266 | 1,266 | 1,266 | 1,266 | - |
| | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 |
| | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 |
| | | | | | |
| | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| | | | | | |
| | 43,266 | 35,805 | 49,665 | 46,200 | 12,774 |
| | 23,100 | 23,100 | 23,100 | 23,100 | 23,100 |
| | 13,860 | 13,860 | 13,860 | 13,860 | 13,860 |
| | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| | 569 | 569 | 569 | 569 | 569 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| | 3,480 | 3,480 | 3,480 | 3,480 | 3,480 |
| | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| | - | - | - | - | - |
| | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 |
| | 39,276 | 31,733 | 25,487 | 39,276 | 31,733 |
| | 167 | 167 | 167 | 167 | 167 |
| | | | | | |
| | 234,416 | 213,961 | 221,425 | 231,653 | 189,568 |
| | | | | | |
| | 103,084 | (129,586) | 31,700 | 105,847 | (105,193) |
| | | | | | |
| | 56,250 | | | | |
| | 18,750 | 18,750 | | | |
| | | | 56,250 | 56,250 | |
| | | | | 18,750 | 18,750 |
| | 75,000 | 18,750 | 56,250 | 75,000 | 18,750 |
| | $ 4.50 | $ 4.50 | $ 4.50 | $ 4.50 | $ 4.50 |
| | 337,500 | 84,375 | 253,125 | 337,500 | 84,375 |
| | | | | | |
| | 8,516 | | | | |
| | 4,258 | | | | |
| | 20,328 | 23,870 | 33,110 | 30,800 | 8,516 |
| | 10,164 | 11,935 | 16,555 | 15,400 | 4,258 |
| | 43,266 | 35,805 | 49,665 | 46,200 | 12,774 |

## Assumptions

### Revenue

Estimating that we will achieve 50% survival rate - due to efficiencies in feeding & regular maintenance (patched holes) in cages.

Anticipating beginning a run at Oceanic Institute in November. Will need Board of Manager approval to sign off equipment as collateral for the $140K that is owed to OI. Our per batch fee will be $54K (plus reimbursables) to Oceanic. This must be paid in advance.

Will do 2 experimental runs at Oceanic - November & March. We will max out the number of fingerlings that the hatchery can produce - estimating around 450,000 pieces. Since we will have the cage space, we will split each batch into 2 cages - one cage with 300,000 pieces and the other with approximately 100,000 pieces. Ryan believes that he can attain a higher survival rate with the 100,000 fingerlings and will compare that to the 300k fingerlings.

Anticipating beginning work on the Environmental Assessment required for Campbell in November 2010. This is estimated to take about 9 months to complete. This means that our first batch produced out of Campbell will begin in August 2011 - not producing revenue until April/May 2012.

### Expenses

Majority of the expenses are consistent with 2010 numbers with no significant fluctuations expected.

Legal fees are high due to potential Chapter 11 filing & the Dan Habel case. We anticipate they will taper off in early 2011.

Contract labor is related to the work that needs to be done on the Environmental Assessment. It is estimated based on John Corbin's costs for the previous EA.

Hatchery Feed: based on prior runs, it costs $16K at Oceanic Institute. Other than that, we anticipate none of these expenses until we begin operations in Campbell. We anticipate feed costs will be more than double in Campbell.

Labor: we will keep labor constant through about April/May 2011 when we'll need to increase the offshore crew by about 10% due to the volume of inventory & required feedings.

Other hatchery costs: similar to the feed, we'll have a few costs at Oceanic & then it will ramp up again in August 2011 when we begin operations at Campbell.

Cage Feed: per Ryan's schedule of feeding & approximating feed to cost about $0.70 per pound. It will ramp up significantly when all 4 cages are filled & we have no begun harvesting. We are only anticipating 2 runs at Oceanic & not stocking cages again until our first Campbell run in August 2011.

Dept of Commerce Loan: this number includes principle & interest payments to National Marine Fisheries for all draws on the $8M line.

## Description of Collateral

FIRST. All right, title and interest of the Debtor in and to any and all leases of personal property, partial assignments, subleases and other contracts of conveyance (collectively, the "Leases") for all or any of the items of Collateral described herein, including without limitation, all equipment leases and use agreements for machinery, equipment and other personal property used in connection with the operation of the Debtor's business, and any and all modifications and extensions thereof;

Together with all of the Debtors rights and remedies thereunder, and the benefit of all covenants therein, including, without limitation thereto, the right to receive all monies, rents or payments of every other kind due or to become due to the Debtor under the Leases;

SECOND. All right, title and interest of the Debtor in and to any and all binders or policies of insurance of any kind (the "Insurance Policy") covering all or any portion of the Debtor's business or any of the Collateral described herein; and any and all riders, amendments, extensions, renewals, supplements or revisions thereof;

Together with all of the Debtor's rights and remedies thereunder, the benefit of all covenants therein and all proceeds therefrom;

THIRD. All right, title and interest of the Debtor in and to any and all accounts (as that term is defined in Section 490:9-102 of the UCC, contract rights, issues, profits, earnings, receipts, royalties, revenues, instruments, documents, chattel paper and receivables (including but not limited to, choses in action, tax refunds, refunds of deposits and insurance proceeds) of, or any other obligations or indebtedness to, the Debtor from whatever source arising; all rights of the Debtor to receive any payments in money or kind; all guarantees of the foregoing and security therefor; and all types of property (whether or not named above) included within the terms "account," "chattel paper," and "contract rights" as defined in the UCC with respect to, or which may in any way pertain to the business of the Debtor (the "Accounts") ;

FOURTH. All right, title and interest of the Debtor in and to all of the Debtor's personal property and fixtures of any kind, including, without limitation, all furniture, furnishings, machinery, appliances, apparatus, equipment, fittings, fixtures and articles of personal property of every kind and nature whatsoever.

FIFTH. All right, title and interest of the Debtor in and to any and all awards or payments, including interest thereon, and the right to receive the same, which may be with respect to the Debtor's business by any public or quasi-public authority or corporation as a result of (a) the exercise of the right of eminent domain, (b) the alteration of the grade of any street, or (c) any other injury to or decrease in the value of the Debtor's business, the Debtor agreeing to execute and deliver, from time to time, such further instruments as may be requested by the Secured Party to confirm such assignment to the Secured Party of any such award or payment;

SIXTH. All right, title and interest of the Debtor in and to (i) any general intangibles (as that term is defined in Section 490:9-102 of the UCC) with respect to, or which may in any way

## EXHIBIT B

pertain to, the operation of the business of the Debtor, including, without limitation (a) any trade names, trademarks and good will relating to the operation of the Property or the business of the Debtor, (b) all prints, labels, advertising concepts and literature, information, blueprints, shop drawings, plans, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, catalogs, books, records and the like relating to the operation of the Property or the business of the Debtor, and (c) all refunds, rebates, security deposits or other expectancy under or from any account or contract and (ii) any and all commercial tort claims as that term is defined in Section 490:9-102; and

SEVENTH. All right, title and interest of the Debtor in and to all other permits, licenses, appraisals, consents, variances, certifications, approval of governmental agencies and any other documents, materials or personal property of any kind now or hereafter existing for the business of the Debtor and belonging to the Debtor.

EXHIBIT  B

WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com

Proposed Attorney for Debtor
and Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>GROVE FARM FISH & POI, LLC,<br><br>             Debtor. | CASE NO. *10-03340*<br>(Chapter 11)<br><br>DATE:<br>TIME:<br>JUDGE: Hon. Robert J. Faris |

### INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON A SECURED AND SUPERPRIORITY BASIS AND SCHEDULING FINAL HEARING ON MOTION; EXHIBIT "A"

The Motion for Order Authorizing Debtor to Obtain Post-Petition Financing on a Secured and Superpriority Basis and Scheduling a Final Hearing on Motion; Exhibit "A" (the "Motion") filed by Grove Farm Fish & Poi, LLC, debtor and debtor in possession (the "Debtor") came on for an

**EXHIBIT B**

interim hearing on November 1, 2010 before the Honorable Robert J. Faris. Appearances are as noted in the record.

Having reviewed the Motion and all papers filed in support thereof including the proposed Debtor-in-Possession Loan Agreement (the "Agreement") attached as Exhibit "A" hereto between the Debtor as borrower and Visionary, LLC as lender (the "Lender"), and having considered the oral arguments made at the hearing, the Court finding that: (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1 57 and 1334, (h) this is a core proceeding pursuant to 28 U.S.C. § 1 57(b)(2), (c) notice of the interim hearing on the Motion was proper and sufficient under the circumstances, (d) the Lender is a good faith lender within the meaning of 11 U.S.C. § 364(e) and entitled to its protections; and (d) interim relief is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, and being satisfied with the legal and factual bases set forth in the Motion to grant the requested relief on an interim basis, and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     The Motion is granted on an interim basis as set forth below. This Order shall be valid, binding on all parties-in-interest, and fully effective immediately upon entry.

2.     The terms and provisions of the Agreement are approved on an interim basis, except that, to the extent of any conflict between the terms of the Agreement and this Order, the terms of this Order shall control.

3.     This Order shall expire on the earlier of (a) November 30, 2010, if the Final Order has not been entered by the Court and (b) such earlier date on which the obligations hereunder shall become due and payable in accordance with the terms of this Order and the Agreement (the "Termination Date"). Unless the Final Order approving Motion has been entered, on the Termination Date, any interim advances made under this Order shall mature and, together with all interest thereon, will become immediately due and payable unless such advances have previously become due and payable by way of acceleration or otherwise. On the Termination Date, the Lender shall have no further obligation to provide financing under the Agreement.

4.     Upon entry of this Order, the Debtor is immediately authorized to obtain interim advances under the Agreement in an amount not to exceed $250,000.00 per month, as limited by the budgets described in the Agreement, in accordance with and subject to the terms of the Agreement.

5.     Subject to the "Carve-Out" as defined in the Agreement, all advances made by the Lender to the Debtor in accordance with this Order and the Agreement shall:

a.     be granted super-priority administrative expense status under 11 U.S.C. § 364(c)(1), with priority over all administrative expenses of and unsecured claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, 11 U.S.C. § 105,326,328,503(b), 506(c), 507(a), 507(b), 546(c) and 1114, and;

b.     under 11 U.S.C. § 364(c)(2), subject only to the lien held by National Marine Fisheries Service, if any, be secured by a second priority, fully perfected security interest in and lien, on all pre-petition and post- petition personal property of the Debtor's estate, whether existing as of the entry of this Order or thereafter acquired, that, on or as of the entry of this Order, including, without limitation, all cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the entry of this Order, contracts, equipment, general intangibles documents, instruments, patents, copyrights, trademarks, trade names, and other intellectual property.

6.     All security interests granted to the Lender hereunder shall he deemed to he duly and validly perfected as of the date of the entry of this Order without the necessity of further filings that may otherwise be required under applicable state law, provided however, that the Lender is hereby granted relief from the automatic stay to the extent the Lender, in its sole discretion, determines that the filing and/or recording of any security instruments related to the Agreement is in its best interest.

7.     Upon the occurrence of an event of payment default or other material default under the Agreement, upon five (5) court days' notice to the Debtor and any creditors' committee, the Lender is granted relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), unless during said five-day notice period, the Debtor or any creditors' committee files a motion, supported by admissible evidence, contesting whether a default has occurred, and within ten days thereafter, the court enters an order finding that no payment default or other material default in fact has occurred.

8.     This Order shall be binding on the Debtor, its estate, its creditors, and any subsequently appointed chapter 11 or chapter 7 Trustee, provided however, that the liens and priorities granted to the Lender shall

be subordinate to the fees and costs of any chapter 7 Trustee, but not the fees and costs of the chapter 7 Trustee's professionals.

9. This Order shall inure to the benefit of the Lender or the Debtor and their respective successors and assigns.

10. A final hearing on the Motion shall be held on November ___, 2010 at _____ o'clock ___.m.

DATED: Honolulu, Hawaii, _____

In re GROVE FARM FISH & POI, LLC; CASE NO. _*10-03340*_ ; INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON A SECURED AND SUPERIORITY BASIS AND SCHEDULING FINAL HEARING ON MOTION; EXHIBIT "A"