WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com

Proposed Attorney for Debtor
and Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>GROVE FARM FISH & POI, LLC,<br>dba HUKILAU FOODS,<br><br>      Debtor and<br>      Debtor-in-possession.<br><br>64982 | Case No. 10-03340<br>(Chapter 11)<br><br>Judge: Hon. Robert J. Faris |

OMNIBUS DECLARATION OF
REIKO YOSHIDA IN SUPPORT OF FIRST DAY MOTIONS

I REIKO YOSHIDA, hereby declare that:

1. I am and have been one of the Managers of Grove Farm Fish & Poi, LLC, dba Hukilau Foods ("Debtor") since June 24, 2010. I served as acting Secretary for the Debtor from March 2009 to Present. In these capacities I am familiar with the Debtor's operations and history.

2. I make this declaration upon my own personal knowledge and my review of Debtor's books, files, and business records.

## FORMATION

3. The Debtor was formed on June 5, 2006, pursuant to the terms of a Definitive Investor Agreement between John R. Cates ("Cates") and Visionary LLC, a Virginia limited liability company ("Visionary"), pursuant to which the to be formed Debtor would acquire substantially all of the assets of Cates International, Inc., a Hawaii corporation ("CII"), owned by Cates, and expertise in the fish hatchery and open ocean agriculture business from Cates and thereafter engage in the fish hatchery and open ocean agriculture business. Visionary is owned by the Steve Case Trust. The Definitive Investor Agreement "closed" on or about April 1, 2007.

4. Pursuant to the terms of the Definitive Investor Agreement and the Operating Agreement of Grove Farm Fish & Poi, LLC, the ownership of the company would be and is held 51% by Visionary and 49% by Cates. Pursuant to the Investor Agreement, Visionary would and did contribute $500,000 to the Company in exchange for its 51% membership interest and subsequently contributed $4.5 million of additional capital to the Company to be used for capital expenses and funding the operations of the Debtor. Visionary is entitled to a preferred return on its capital contributions equal to 2.50% above the First

Hawaiian Bank prime rates prior to any distribution to members based on ownership units.

5. Cates agreed to and did cause CII to sell all of the assets currently then owned by CII, including but not limited to, the operating vessels, open ocean cages, automated feeder, hatchery facilities, and equipment, leases and other operating assets of CII to the Debtor for the sum of $100,000, together with the assumption by the Company of loans due the United States of America, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Financial Services Division ("NMFS") in the amount of approximately $1,426,000 and $169,567 in accounts payable in current liabilities.

6. Further, pursuant to the Definitive Investor Agreement, Cates agreed to and did sell a portion of his expertise to the Debtor for the sum of $400,000, and contributed the remainder of his expertise to the Debtor in exchange for a 49% membership interest in the Debtor. Cates entered into an employment agreement and non-competition agreement with the Debtor. As part of the consideration for the sale and contribution of Cates' expertise to the Debtor, Cates agreed to fully document for the Company all processes and procedures currently used in CII's operations and as developed from time to time by the Debtor.

## MARKET

7. The U.S. is leading the new field of open ocean fish farming. Pressures against farming in near shore U.S. waters forced innovation and led to several open water cage culture operations, first as research projects and now as commercial ventures. This new branch of aquaculture makes use of technical advances and offers American fish farmers their best chance for reclaiming part of the domestic market for aquaculture products.

8. A report prepared on behalf of the Reason Foundation and Grassroots Institute of Hawaii summarizes that unlike near shore aquaculture, the primary benefits of offshore open ocean fish farming to be improved water circulation and limited risks from pollution. NOAA highlights the uniqueness of offshore fish farming:

- **Submerged cages**: The offshore cage system is submerged 40 to 50 feet below the surface to avoid navigational conflicts and to preserve aesthetic aspects of the area.

- **Improved cage security**: Submerging the cage reduces vandalism, reduces cage damage by surface waves, provides a more benign environment for fish stock, eliminates bird predator issues, and greatly reduces chances of lost stock and equipment.

- **Reduced environmental impact**: The water depth of the offshore sites (>100 ft.) and steady currents (between 0.5-1.5 knots) disperse organic and inorganic material widely, resulting in little organic build-up beneath the cages. Nutrient increases are undetectable within 100 meters of cages.

- **High water quality**: NOAA's current commercial scale studies have shown no observable disease. Therefore, antibiotics are not needed. Additionally, stronger currents offshore keep the fish in physical condition similar to wild stocks.

- **Higher economic return**: The potential scale of offshore aquaculture can result in better economic returns than many existing onshore aquaculture technologies.

Still, challenges for offshore farming remain including engineering anchoring, feeding and harvesting systems, monitoring and transporting to far-offshore sites, fingerling survival rates, navigation, mammal interactions, and ocean leasing.

9. Hawaii's per capita seafood consumption is three times the national average, and many groups will pay a premium price for fresh fish. Total annual consumption is approximately 50 million pounds with 70% imported, largely in frozen and processed forms. Significantly, the tourist population and

resident ethnic populations prefer fresh, quality seafood. Most visitors are also from the world's largest seafood importing markets: the U.S. Mainland and Japan.

## OPERATIONS AND FINANCING

10. The Debtor currently has 10 employees in its fish farm operations.

11. Pursuant to that certain Managerial and Administrative Services Agreement, dated April 1, 2007, between the Debtor and Haili Moe, Inc. ("Haili Moe"), Haili Moe provides office, accounting, budget, cash flow, and other administrative services to the Debtor. Haili Moe charges the Debtor $5,000 per month for all of such services. Haili Moe is owned 90% by the Steve Case Trust and 10% by the employees and directors of Haili Moe. Haili Moe also provides group medical and dental coverage for the Debtor's employees.

12. The Debtor's fish farm is situated two miles offshore of Ewa, Oahu and contains an area of 28.077 acres leased from the State of Hawaii, pursuant to that certain Mariculture Lease General Lease No. S-5654, dated August 23, 2002 ("Mariculture Lease"). The Mariculture Lease has a term of 20 years through March 2021. Annual rent for the first 10-year term is the greater of $1,400 or 1% of gross revenue. The percentage rent will reopen and be redetermined in 2011.

13. The Debtor currently operates a single farm with four submerged cages (maximum allowed under the existing lease). The cages, Sea Station 3000 manufactured by OceanSpar, are made from steel and NASA developed mesh. The 50 foot tall-by-80 foot wide bi-conical cages with internal volume of 92,000 cubic feet lie about 40 feet under the surface of the water and about 50 feet off the seafloor. The four cages have a total hold capacity of 1 million pounds of fish. Given a seven-month growth cycle of moi, the existing cages can produce 1.7 million pounds in a year. Attached hereto as Exhibit "A" is a schematic of the fish farm cages.

14. The Debtor currently sources its fingerlings for cage stocking from the Oceanic Institute ("OI").

15. On January 1, 2006, CII executed a ground lease with the State Department of Agriculture for a 3.769-acre site for a new hatchery facility in the Kalaeloa Agricultural Park in Ewa, Oahu, Department of Agriculture General Lease No. S-8501 ("Hatchery Lease"). The 45-year lease extends through 2050. Annual base rent for the first 15-year term is $6,900 with a two-year rent allowance to offset the cost of land clearing and leasehold improvements. Base rent will be reopened and redetermined on the 15th, 25th, and 35th anniversaries thereafter. Additional annual percentage rent, equal to 2% of gross proceeds from the sale of

commodities produced at the hatchery, are also payable. Construction is currently underway at the site and is targeted for completion by late 2011.

16. To finance construction and working capital through the initial hatchery operations, CII initially received and the Debtor thereafter received approval from the NMFS for a series of loans totaling approximately $3,817,423 as of September 30, 2010. The loans have a 20-year maturity with an interest rate equal to the U.S. Treasury rate for agency borrowing. The loans are collateralized by all of the Debtor's assets and are guaranteed by Cates and Visionary.

17. In addition to its capital contributions of $5 million, Visionary had loaned the Debtor $4,386,512 as of the Petition Date, on an unsecured basis, pursuant to the terms of the Debtor's Operating Agreement.

18. Although the Debtor was formed with the expectation of reaching profitability in its third year of business, it has not been able to fulfill those expectations. The Company lost $2,284,952 for the year ended December 31, 2009, and has sustained a loss in the amount of $2,431,380 the first nine months of 2010. Book value of the Debtor's assets was approximately $4,986,676 as of September 30, 2010. The Debtor estimates that the liquidation value of the Debtor's assets is substantially below their book value. Total liabilities as of September 30, 2010, were approximately $8,586,563.

## MANAGEMENT

19. Pursuant to the Definitive Investor Agreement and the Operating Agreement, the Debtor is managed by five managers, two appointed by Cates and three appointed by Visionary. The original managers appointed by Cates were Cates and John Forester. The three managers appointed by Visionary were Warren Haruki, Neil Tagawa, and Timothy Johns. Neil Tagawa was later replaced by Keith Yap.

20. Cates served as President of the Debtor from inception to June 24, 2010.

21. In June of 2010, in light of the litigation described below, Warren Haruki and Keith Yap resigned as managers and Visionary selected Michael Tresler and Declarant to replace them. John Foster also resigned, but was replaced by Cates and Brian Ho in August of 2010.

22. At a meeting of the Board of Managers held on June 24, 2010, Cates was removed as President of the Debtor, without cause, in accordance with the terms of his employment agreement. The board replaced Cates as President with Ryan Murashige, as Interim President and Chief Executive Officer.

23. The current board of managers is comprised of Timothy Johns, Chair; Michael Tresler, Reiko Yoshida, Cates, and Brian Ho.

## LITIGATION

24. On June 9, 2010, Cates filed that certain action entitled *John R. Cates v. Warren Haruki, et al.*; Civil No. 10-1-1273-06 in the Circuit Court of the First Circuit, State of Hawaii ("Derivative Action"). The Derivative Action asserts claims by Cates individually and derivatively as a member of the Debtor against the Debtor, Haruki, Keith Yap, Visionary, and others for breach of fiduciary duties, tortuous interference with fiduciary duties, misrepresentation, constructive fraud, and other claims. The prayer seeks monetary and injunctive relief.

26. On July 12, 2010, Visionary filed a Counterclaim against Cates and CII asserting derivative and direct claims against Cates and CII for breach of fiduciary duties, unjust enrichment, and other causes of action. The prayer seeks monetary and injunctive relief.

27. The Debtor has filed nominal Answers to both the Complaint and the Counterclaims.

DATED: Honolulu, Hawaii, November 1, 2010.

_____
REIKO YOSHIDA